IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC RUDOLPH | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket No.  3:22-cv-38 |
| WELLPATH, f/k/a CORRECT CARE | ) | |
| SOLUTIONS, LLC, RAJINDER | ) | |
| MALHI, MD, FAWN BALDAUF, CRNP, | ) | |
| GABRIELLE NALLY, PA-C, | ) | |
| *Defendants*. | ) | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Eric Rudolph, by his attorneys at the Mizner Law Firm, files this Complaint and states as follows:

### A. Parties.

1. Plaintiff Eric Rudolph is an adult individual who is currently incarcerated at the State Correctional Institution at Coal Huntingdon ("SCI Huntingdon"), located at 1100 Pike St, Huntingdon, Pennsylvania 16654.

2. Defendant Wellpath, formerly known as Correct Care Solutions, LLC ("Wellpath") is a Kansas Corporation with a principal place of business at 1283 Murfreesboro Pike Street 500, Nashville, TN 37217-2421. Wellpath provides, through a contract with the Commonwealth, medical care and services for the Department of Corrections, including the State Corrections Institute at Houtzdale, during the relevant time period.  Wellpath is vicariously liable for the acts of its employees, agents and/or servants, including without limitation Fawn Baldauf, CRNP, Gabrielle Nally, PA-C, and Rajinder Malhi, MD.

1

3. Defendant Fawn Baldauf, CRNP, is an adult individual who at all times was employed as a medical provider by Wellpath to provide medical services at SCI Huntingdon. At all times, CRNP Baldauf was acting under color of state law and within the course and scope of her employment and/or agency with Wellpath.

4. Defendant Gabrielle Nally, PA-C, is an adult individual who at all times was employed as a medical provider by Wellpath to provide medical services at SCI Huntingdon. At all times, PA-C Nalley was acting under color of state law and within the course and scope of her employment and/or agency with Wellpath.

5. Defendant Rajinder Malhi, MD, is an adult individual who at all times was employed as a medical provider by Wellpath to provide medical services at SCI Huntingdon. At all times, Dr. Malhi was acting under color of state law and within the course and scope of his employment and/or agency with Wellpath.

### B. Jurisdiction and Venue

6. This action is being brought under the Civil Rights Act, 42 U.S.C. § 1983 which provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and the laws" of the United States.

7. This Honorable Court has jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 & 1343.

8. This Complaint also includes pendent state law claims, over which this Honorable Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

9. Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred

within the territorial jurisdiction of this District and the Defendants are subject to personal jurisdiction within this District.

## C. Facts

10. At all relevant times, Mr. Rudolph has been incarcerated at SCI Huntingdon.

11. Shortly after his arrival at SCI Huntingdon, on July 13, 2020, Mr. Rudolph reported to Gabrielle Nally, PA-C, that his vision was growing worse, and requested an eye exam.

12. PA Nally ordered a "Snellen," referencing a eye chart test used to measure visual acuity, and noted that Mr. Rudolph would be "referred if necessary."

13. On July 28, 2020, Mr. Rudolph underwent the Snellen test, which indicated the following results:

    Distance non-corrected both eyes - 20/40
    Distance non-corrected right eye - 20/70
    Distance non-corrected left eye - 20/40

    Near non-corrected both eyes - 20/200
    Near non-corrected right eye - 20/400
    Near non-corrected left eye - 20/200

14. On August 6, 2020, Mr. Rudolph underwent another Snellen Test, which indicated that his vision was poor even while wearing his glasses:

    Distance corrected both eyes - 20/40
    Distance corrected right eye - 20/100
    Distance Corrected left eye - 20/40

    Near corrected both eyes - 20/100
    Near corrected right eye - 20/200
    Near corrected left eye - 20/100

15. As a result of Mr. Rudolph's documented vision problems, RN Paula Price indicated that he should be referred to the "eye clinic" at the prison.

16. Despite that, Mr. Rudolph was not seen again by anyone in the medical for his vision problems until October 14, 2020, when he reported blurry vision, and that he could not see with his glasses on.

17. The provider, Fawn Baldauf, CRNP, noted that Mr. Rudolph had "failed" his Snellen vision screening in August, and was awaiting an optometry appointment.

18. Six weeks later, on November 30, 2020, Mr. Rudolph had still not been seen by an optometrist, and reported to Mental Health provider Mark Peters that he was concerned with the vision loss in his right eye, which he had reported to the medical department.

19. More than two weeks later, on December 17, 2020, Mr. Rudolph was seen in the medical department by Rajinder Malhi, MD and reported decreased vision, which had been degenerating for a period of six to eight months.

20. By that time Mr. Rudolph had to squint to see things, reported that his vision was like looking through a curtain, and that his eyes were watering in bright light.

21. He was assessed with having cataracts in both eyes, and referred to an ophthalmologist - the same referral that CRNP Baldauf had made two months prior.

22. For the first time, a consultation record was generated on behalf of Mr. Rudolph for an ophthalmology consultation, and he was scheduled for an appointment nearly six weeks later, on January 25, 2021.

23. Before that appointment took place, Mr. Rudolph was seen again in the prison medical department by PA-C Nalley, who noted his complaints of decreased vision, light sensitivity and frequent watering in his eyes. No treatment plan was created, other than the

notation that Mr. Rudloph was already scheduled to see an ophthalmologist, and that he could "follow up as needed."

24. On January 25, 2021, Mr. Rudolph was finally seen by an ophthalmologist, Dr. Christopher Patitsas, who diagnosed him with Chronic Angle Closure Glaucoma in both eyes.

25. Dr. Patitsas' plan was for YAG Peripheral Iridotomy, ("YAG PI") in the left eye that day, and then in the right eye "very soon."

26. A YAG PI is a surgical intervention in the eye with a laser, intended to create a tiny opening in the peripheral iris, allowing aqueous fluid to flow from behind the iris directly to the anterior chamber of the eye.

27. Dr. Patitsas noted that the procedure might not restore the vision in either eye, but that he felt it had to be attempted, and Mr. Rudolph consented to the operation.

28. The next day following the procedure, Dr. Patitsas examined Mr. Rudolph's left eye, and based on improved control of the glaucoma, decided with Mr. Rudolph's consent to proceed with the same procedure on the right eye.

29. Mr. Rudloph underwent the Yan PI on his right eye on February 16, 2021, and was found to be in "stable" condition following the procedure by Dr. Patitsas, who ordered that he follow up in two months.

30. On April 19, 2021, Mr. Rudolph was seen by Dr. Patitsas, whose impression was that he needed to acquire spectacles, resume his use of Cosopt, an eyedrop used to treat glaucoma patients, and return for follow-up in six weeks.

31. On May 10, 2021, Mr. Rudolph was seen by PA-C Nalley, who ordered him "bottom tier" status due to concerns he would fall down the stairs because of his poor vision.

32. On October 18, 2021, Dr. Patitsas examined Mr. Rudolph and found that he had severe advanced end stage chronic angle closure glaucoma in both eyes. He ordered three different eye drops, Cosopt, Xalatan, and Alphagan.

33. Unfortunately, Mr. Rudolph's vision has never returned to normal, and it is unlikely to do so, as vision loss from glaucoma is irreversible.

34. Had Mr. Rudolph been referred to the optometrist for diagnosis and intervention immediately in July when he reported his vision loss, or even in August when he "failed" the diagnostic testing, he would have avoided the months of vision loss caused by the advancing glaucoma.

35. Tragically, due to the delay of his medical providers, he has permanently-impaired vision which makes even activities like using the stairs dangerous, which is directly attributable to the unjustifiable delay in his diagnosis and treatment.

36. The day after his first operation with Dr. Patitsas, Mr. Rudolph filed a grievance against the medical department at SCI Huntingdon, stating that he had just learned he had glaucoma in both eyes, not cataracts as he had previously been told.

37. Mr. Rudolph noted that Dr. Malhi had never performed a proper eye exam on him, and that the six month delay had resulted in permanent damage to his eyesight.

38. On February 19, 2021, Mr. Rudolph's grievance was denied by Healthcare Administrator Price, who without disputing that there had been a six month delay in his treatment, wrote that "there is no proof that your condition would have been different under different circumstances in timing."

39. Mr. Rudolph timely appealed, and this time his appeal was denied by Facility Manager Kauffman, who wrote: "I can only reiterate that I uphold the response provided by the grievance officer. Your grievance and relief are denied."

40. Mr. Rudolph received a final response to his grievance on September 22, 2021, partially upholding his grievance: "it was determined that your grievance is upheld in part related to optometry not coming to SCI Huntingdon as a result of Covid-19 restrictions… no evidence of wrongdoing was identified except for the above-mentioned uphold portion of the grievance. Your requested relief is denied."

41. Thus, even the Department of Corrections has now acknowledged that the delay in diagnosis and treatment that Mr. Rudolph endured was wrong and unjustified, albeit without compensating Mr. Rudolph in any way for the injury he suffered as a result.

### COUNT I - DELIBERATE INDIFFERENCE IN VIOLATION OF THE EIGHTH AMENDMENT

*Eric Rudolph*
*v.*
*Fawn Baldauf, CRNP, Gabrielle Nally, PA-C, Rajinder Malhi, MD*

42. The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

43. "Failure to provide medical care to a person in custody can rise to the level of a constitutional violation under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995).

44. A "serious medical need" is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the

7

necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

45. A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

46. Mr. Rudolph reported his decreasing vision to the medical department at SCI Huntingdon as early as July 13, 2022.

47. Loss of vision is a serious medical need.

48. Fawn Baldauf, CRNP, Gabrielle Nally, PA-C, and Rajinder Malhi, MD (the "individual medical defendants") knew of Mr. Rudolph's serious medical needs

49. Despite this knowledge, the individual medical defendants, through their inaction, delayed and denied Mr. Rudolph the individualized care his serious medical needs required- namely, a consultation with an ophthalmologist - for over six months.

50. By denying Mr. Rudolph timely individualized care and treatment of his diminishing vision, the individual defendants have denied him treatment which was consistent with the medical standard of care, and have by omission imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

51. The denial of timely medical care for Mr. Rudolph's diminishing vision violated all standards of decency, contrary to the Eighth Amendment.

WHEREFORE, Plaintiff Eric Rudolph seeks judgment in his favor and against Fawn Baldauf, CRNP, Gabrielle Nally, PA-C, and Rajinder Malhi, MD in an amount in excess of $75,000, along with all other relief permitted by law.

## COUNT II
## PROFESSIONAL NEGLIGENCE

*Eric Rudolph*
*v.*
*Fawn Baldauf, CRNP, Gabrielle Nally, PA-C, Rajinder Malhi, MD*

52. The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

53. As Mr. Rudolph's treating medical providers, employees and/or agents of Wellpath, including but not limited to the individual medical defendants, owed a duty of care to Mr. Rudolph to ensure that he was referred to an opthamologist.

54. Another aspect of this duty was to provide Mr. Rudolph with the minimum standard of care required for someone in his condition and with his medical needs.

55. The standard of care for someone in Mr. Rudolph's condition was to be referred to an ophthalmologist for a consultation in a timely manner, and to follow the recommendation of the opthamologist.

56. The individual medical defendants failed and refused to ensure Mr. Rudolph was timely referred to an opthamologist for a consultation.

57. The PADOC contracted with Wellpath to provide medical care and services for the Department of Corrections, including at SCI Huntingdon, during the relevant time period.

58. Wellpath and/or its employees and/or agents are responsible to ensure that Mr. Rudolph was referred to an opthamologist for a consultation.

59. The medical care, diagnosis, treatment and services rendered by the individual medical defendants, and possibly other employees and/or agents of Wellpath, was performed in a negligent and careless manner and not in accordance with professional standards required of the conditions presented by Mr. Rudolph.

60. The individual medical defendants, and possibly other employees and/or agents of Wellpath, failed to possess and/or exercise adequate medical skills, knowledge, experience and techniques for the proper treatment of Mr. Rudolph.

61. As a direct and proximate result of the negligence by the employees and agents of Wellpath, including but not limited to the individual medical defendants, and possibly other employees and/or agents of Wellpath, Mr. Rudolph has continued to suffer from substantial and irreversible loss of vision in both eyes.

62. As a direct and proximate result of the negligence by the employees and agents of Wellpath, including but not limited to individual medical defendants, Mr. Rudolph has experienced pain and suffering, inconvenience, limitation on activities of daily living, mental anguish, and humiliation and embarrassment.

63. Wellpath is vicariously liable for the negligent actions of its employees and/or agents, including but not limited to the individual medical defendants.

WHEREFORE, Plaintiff Eric Rudolph seeks judgment in his favor and against Fawn Baldauf, CRNP, Gabrielle Nally, PA-C, Rajinder Malhi, MD, and Wellpath in an amount in excess of $75,000, along with all other relief permitted by law.

Respectfully submitted,

MIZNER LAW FIRM

By: /s/ John F. Mizner

John F. Mizner
PA Bar No. 53323
jfm@miznerfirm.com

Joseph P. Caulfield
PA Bar No. 322823
jpc@miznerfirm.com

311 West Sixth Street
Erie, Pennsylvania 16507
(814) 454-3889

*Attorney for the Plaintiff*

11